**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| TESLA, INC., SPACE EXPLORATION TECHNOLOGIES CORP., and SPACEXAI LLC,<br>Plaintiffs,<br>v.<br>TERA-PRINT, LLC,<br>Defendant. | Case No. ____________________<br>**COMPLAINT FOR DECLARATORY JUDGMENT**<br>**JURY TRIAL DEMANDED** |

Plaintiffs Tesla, Inc. ("Tesla"), Space Exploration Technologies Corp. ("SpaceX"), and SpaceXAI LLC ("SpaceXAI," and collectively, "Plaintiffs"), by and through their undersigned attorneys, file this Complaint against Defendant TERA-print, LLC ("TERA-print"), and allege as follows:

## INTRODUCTION

1. This is an action for declaratory judgment. Plaintiffs seek rulings that they are not infringing any trademark rights claimed by TERA-print and are not violating any related laws.

2. Tesla, SpaceX, and SpaceXAI are embarking on a collaboration to build a chip factory capable of producing enough chips for more than one terawatt of AI compute power per year. The project, dubbed Terafab, will integrate chip design and manufacturing, logic, memory, and packaging under one roof, dramatically improving the speed and efficiency of innovation and production for AI chips, which are semiconductor chips specifically designed to quickly perform the kinds of calculations that AI requires. Planned for initial testing and ramp-up in Austin, Texas, Terafab is intended to revolutionize the chip-making industry and

dramatically increase domestic production of these critical components, paving the way for American advancements in artificial intelligence tools, robotics, space travel, and other cutting-edge technologies.

3. Terafab has not yet begun commercial operations. Plaintiffs, however, have publicly announced the project and have taken steps to protect their rights in the Terafab name. Elon Musk, Chief Executive Officer of Tesla and SpaceX, announced Terafab on March 21, 2026. On May 18, 2026, Tesla filed three United States trademark applications: one for a standard-character TERAFAB mark, Serial No. 99/829,894; one for a stylized TERAFAB mark, Serial No. 99/829,877; and one for a TESLA TERAFAB mark, Serial No. 99/829,887. These marks are referred to collectively as the "Tesla TERAFAB Marks," and the filed applications are shown in Exhibits A-C.

4. After Musk's public announcement of the Terafab project and Tesla's filing of the three U.S. applications, Defendant TERA-print issued a cease-and-desist letter to Tesla, SpaceX, and SpaceXAI on May 23, 2026. In that letter, TERA-print claimed that Plaintiffs' use of Terafab is likely to cause confusion with TERA-print's TERA-FAB line of products and therefore infringes TERA-print's purported TERA-FAB trademark (U.S. Trademark Registration No. 6,295,482). TERA-print demanded that Plaintiffs immediately and permanently discontinue use of the Terafab name in connection with Plaintiffs' Terafab project. Later, on June 10, 2026, TERA-print threatened to sue Plaintiffs for federal trademark infringement, common law trademark infringement, false designation of origin, and state-law unfair competition.

5. While TERA-print's threats have created an actual, immediate, and justiciable controversy between the parties, its infringement theory is meritless and its enforcement effort is plainly opportunistic.

6. The likelihood of confusion between the Tesla TERAFAB Marks and TERA-print's TERA-FAB mark is vanishingly small. Plaintiffs' Terafab is the project name for a planned factory that will manufacture semiconductor chips for use in the development of AI models, robotics, energy and data infrastructure, and space-based technologies. TERA-print's product is something entirely different. In simple terms, TERA-print sells a tabletop printer that etches microscopic designs onto specialized surfaces for use in bioengineering and similar laboratory applications. On information and belief, TERA-print does not work in chip design, logic, memory, or packaging.

7. No reasonable consumer is likely to believe that Plaintiffs' planned Terafab chip factory is sponsored by, affiliated with, or connected to TERA-print's desktop pen lithography products. The parties' marks arise in different commercial contexts, address different customers, concern different technologies, and point to vastly different undertakings.

8. TERA-print has sought to bolster its meritless infringement allegations through calculated efforts to expand the scope of the trademark rights it purports to hold. Just four days after Tesla filed its U.S. trademark applications—and one day before sending its cease-and-desist letter—TERA-print filed a new trademark application seeking to expand its existing TERA-FAB registration beyond desktop lithography instruments to reach semiconductor-related materials, silicon chips, and artificial-intelligence development services, among other goods and services far removed from TERA-print's existing product offerings. The timing and scope of that filing support the inference that TERA-print sought to broaden its claimed trademark rights in response to Plaintiffs' Terafab project.

9. Plaintiffs therefore bring this action to resolve the controversy created by TERA-print's threats and to obtain a declaration that Plaintiffs' current and planned use of the Tesla TERAFAB Marks does not infringe or otherwise violate

any rights claimed by TERA-print in the TERA-FAB mark and does not violate any related laws.

## THE PARTIES

10. Plaintiff Tesla, Inc. is a corporation organized under the laws of the State of Texas with a principal place of business at 1 Tesla Road, Austin, Texas 78725.

11. Plaintiff Space Exploration Technologies Corp. is a corporation organized under the laws of the State of Texas with a principal place of business at 1 Rocket Road, Starbase, Texas 78521.

12. Plaintiff SpaceXAI LLC is a limited liability company organized under the laws of the State of Nevada with a principal place of business at 800 W Cesar Chavez Street, Austin, Texas 78701.

13. On information and belief, Defendant TERA-print, LLC is a limited liability company organized under the laws of the State of Delaware with a place of business at 8111 Saint Louis Avenue, Suite 1D, Skokie, Illinois 60076.

## JURISDICTION AND VENUE

14. "Federal courts have regularly taken original jurisdiction over declaratory judgment suits in which, if the declaratory judgment defendant brought a coercive action to enforce its rights, that suit would necessarily present a federal question." *Franchise Tax Bd. of State of Cal.* v. *Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 19 (1983). Here, that standard is met. TERA-print has threatened to assert a cause of action for federal trademark infringement in violation of 15 U.S.C. §§ 1114(1) and 1125(a), in addition to other related claims. This Court therefore has subject matter jurisdiction over this declaratory judgment action.

15. This Court has personal jurisdiction over TERA-print based on TERA-print's contacts with Texas. For example, on May 23, 2026, TERA-print sent a cease-and-desist letter to counsel for Tesla, SpaceX, and SpaceXAI, which is

considered, for purposes of due process, to be directed to each Plaintiff's state of residence. On June 10, 2026, TERA-print sent a follow-up communication to Tesla, SpaceX, and SpaceXAI's counsel threatening to sue the parties in an inappropriate venue based on Tesla's planned use of the Tesla TERAFAB Marks in connection with Plaintiffs' Terafab project. On information and belief, TERA-print sent these cease-and-desist communications with knowledge that Plaintiffs are each based in Texas and that Plaintiffs' Terafab facility is being developed and will be physically located in Texas. These contacts are sufficient to establish the Court's personal jurisdiction over TERA-print for purposes of this declaratory judgment action. *See Bounty-Full Ent., Inc.* v. *Forever Blue Ent. Grp., Inc.*, 923 F. Supp. 950, 957 (S.D. Tex. 1996) (personal jurisdiction established over claim for declaratory judgment of noninfringement where defendants' correspondence was "purposefully directed" at "residents of the state of Texas," and the "declaratory judgments address the alleged injuries that arose out of or related to those activities").

16. Further, on information and belief, TERA-print has marketed, offered for sale, and sold its desktop lithography instruments to customers located in Texas, including academic and research institutions, and has provided ongoing technical support to Texas-based users of those products. For example, on information and belief, TERA-print installed one of its desktop pen lithography machines on the campus of Rice University in Houston, Texas, and publicized that installation on its corporate Instagram account on February 27, 2019. In 2023, several Rice University professors authored a research paper disclosing the purchase of "polymer pen arrays" from TERA-print and acknowledged a TERA-print employee's "continuous support." Niklas Gross et al., *High-Throughput Screening of Optical Properties of Glass-Supported Plasmonic Nanoparticles Fabricated by Polymer Pen Lithography*, 127 J. Phys. Chemistry C 19607 (Sept. 26, 2023), https://doi.org/10.1021/acs.jpcc.3c04521. On information and belief, in or around

December 2016, TERA-print also participated in a workshop and/or tour at the Texas Nanofabrication Facility at the University of Texas at Austin.

17. Further, on information and belief, TERA-print entered into a business relationship with Digital Light Innovations ("DLi"), a company based in Austin, Texas, pursuant to which DLi designed and supplied a customized projection system to TERA-print's specifications. DLi has publicly described TERA-print as its "partner[]" in connection with that work.

18. TERA-print purposefully directed its enforcement actions at Tesla, SpaceX, and SpaceXAI in Texas, and this action arises directly out of those actions. It has also purposefully served the Texas market for the very TERA-FAB products whose trademark rights it now seeks to enforce. TERA-print has therefore purposefully availed itself of the state of Texas's business opportunities and has benefited from its contacts with the state.

19. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District, including Plaintiffs' development and planning of the Terafab project, Plaintiffs' initial testing and ramp-up activities in Austin, Texas, and TERA-print's enforcement communications directed at Texas-based Plaintiffs and their planned use of the Tesla TERAFAB Marks in connection with those Texas-centered activities. Additionally, Tesla is headquartered at 1 Tesla Road, Austin, Texas 78725, and maintains substantial business operations in this District; SpaceXAI is headquartered at 800 W Cesar Chavez Street, Austin, Texas 78701; and SpaceX maintains a major rocket development facility in McGregor, Texas, and a Starlink production facility in Bastrop, Texas, both in this District. *See Bounty-Full Ent., Inc.*, 923 F. Supp. at 958 ("[W]hen faced with venue challenges in declaratory judgment lawsuits regarding similar claims of 'noninfringement' of copyrights, trademarks, or unfair competition laws, other federal courts have held that these

causes of action 'arise' wherever the alleged infringer (in this case, the plaintiff[]) is located.").

## FACTUAL BACKGROUND

### A. The Terafab Project

20. Terafab is a collaborative effort among Tesla, SpaceX, and SpaceXAI to create a 100-million-square-foot factory in Texas capable of producing more than one terawatt of AI compute power per year, primarily to drive advancements in artificial intelligence and related technologies. To put that scale in perspective, the current annual output of new AI compute power is approximately 20 gigawatts per year—about two percent of one terawatt.

21. The innovative aspect of Terafab lies in its objective to bring chip design and manufacturing, logic, memory, and packaging under one roof. Today, those functions are distributed across the globe through advanced but separate supply chains involving chip designers, equipment providers, semiconductor manufacturers, and packaging and testing providers. Many participants in the chip industry play important roles in multiple aspects of chip manufacturing. But none has sought to bring the required elements together in a single operation.







22. If successful, Terafab could vastly increase the rate and volume of production of AI-focused semiconductor chips and accelerate advancements across numerous industries that depend on these advanced chips. But at this time, the Terafab project remains in its nascent stage. It has no manufacturing capabilities yet, and it sells no products yet.

**B. The Tesla TERAFAB Marks**

23. Although Terafab has not yet begun commercial operations, Plaintiffs have publicly announced the project and have taken steps to protect their rights in the Terafab name. On May 18, 2026, Tesla filed three related United States trademark applications directed to semiconductor- and fabrication-related goods and services, each of which claims priority to a corresponding Jamaican application. SpaceXAI also filed related applications in Trinidad and Tobago on March 17, 2026.

24. First, Tesla filed Application Serial No. 99/829,877 for a stylized TERAFAB mark, shown below. That application covers Classes 9, 39, 40, and 42. The stylized TERAFAB application identifies goods and services including semiconductor chips, chip carriers, memory chips, integrated circuits, semiconductors, and microchips in Class 9; distribution and delivery services for those goods in Class 39; custom manufacture of semiconductor chips, memory chips, integrated circuits, and wafers in Class 40; and semiconductor design, testing, research, and related technical services in Class 42. The stylized TERAFAB application claims priority to Jamaican Application No. 97043, filed March 30, 2026.

TERAFAB

25. Second, Tesla filed Application Serial No. 99/829,887 for the TESLA TERAFAB standard-character mark. That application covers the same goods and

services as the stylized TERAFAB mark. The TESLA TERAFAB application claims priority to Jamaican Application No. 97042, filed March 30, 2026.

26. Third, Tesla filed Application Serial No. 99/829,894 for the standard-character TERAFAB mark. That application covers Classes 39 and 40. The standard-character TERAFAB application identifies distribution and delivery services for semiconductor chips, chip carriers, memory chips, integrated circuits, semiconductors, and microchips in Class 39, and custom manufacture of semiconductor chips, memory chips, integrated circuits, and wafers in Class 40. The standard-character TERAFAB application claims priority to Jamaican Application Nos. 97041 and 97401, each filed March 30, 2026.

27. Each of the Jamaican applications covers the same mark and goods or services as its corresponding U.S. application. Under U.S. trademark law, an applicant may claim the filing date of a foreign application as the effective priority date for a subsequently filed U.S. application, provided the U.S. application is filed within six months of the foreign filing. 15 U.S.C. § 1126(d). Tesla's U.S. applications therefore have a priority date of March 30, 2026—the date of the Jamaican filings.

**C. TERA-print's Allegations**

28. About two months after Plaintiffs announced the Terafab project, TERA-print sent a cease-and-desist letter to Tesla, SpaceX, and SpaceXAI claiming that their use of Terafab was likely to cause confusion with TERA-print's TERA-FAB products. It then threatened to sue Plaintiffs for trademark infringement. Any potential infringement claim, however, is meritless.

29. On information and belief, TERA-print is a microtechnology startup founded in 2015. It was created to pursue the commercial potential of "cantilever-free scanning probe lithography technology" developed at Northwestern University. TERA-print has developed microfabrication instruments, including its alleged

TERA-FAB line of products, that function as desktop tools for researchers in specialized development efforts. In plain terms, TERA-print makes specialized laboratory equipment that can draw extremely small patterns on surfaces.

30. For example, TERA-print describes its TERA-FAB E series 2.0 product as a "desktop nanoprinter" used to "prototype and manufacture nanostructured surfaces." According to a brochure, the TERA-FAB E product series uses a light-based printing technique to create microscopic features by applying light from LEDs in custom patterns. TERA-print claims its products can be used in areas including microfluidics, sensing, micro- and nanoelectronics, wearables, tissue engineering, and specialized chemical applications. On information and belief, the only products TERA-print sells using the TERA-FAB mark are the desktop printers themselves, which academics and other researchers then use to create microscopic patterns for their own unique purposes. According to TERA-print, its printers can create patterns ranging in size from 250 nanometers to over 100 micrometers.

31. TERA-print claims to own U.S. Trademark Registration No. 6,295,482 for the standard-character mark TERA-FAB. According to U.S. Patent and Trademark Office ("USPTO") records, that registration issued on March 16, 2021, from an application filed June 7, 2017. The registration covers goods in Classes 7 and 9. In Class 7, the registration covers "Polymer pen and beam pen lithography instruments in the nature of 3D micro-printers and 3D nano-scale printers; printing pens, namely, micro-fabricated printing pen arrays for use with 3D printing." In Class 9, the registration covers "Polymer pen and beam pen lithography instruments in the nature of 2D micro-scale molecular and material printers and 2D nano-scale molecular and material printers; printing pens, namely, micro-fabricated printing pen arrays for use with 2D printing." The registration lists first use and first use in commerce as December 2019 for both Classes 7 and 9.

32. For more than six years and counting, TERA-print's alleged federally registered rights have been specifically directed to polymer and beam pen lithography instruments and related printing-pen arrays. These types of instruments are used to draw thin lines to create specialized and custom items like sensors or biological structures. They have no use for large scale manufacturing. TERA-print has no known commercial involvement in the development, manufacture, or distribution of semiconductor chips, nor does it have any capabilities in chip logic, memory, or packaging services.

33. The lithography equipment used for industrial chip production is of an entirely different level of scale and sophistication. For example, the type of lithography-related equipment that may be used at Plaintiffs' Terafab—which can process approximately 200 semiconductor wafers an hour—weighs 165 tons, requires a small army of engineers to assemble, and costs up to $380 million.[1] Suffice it to say, it would not fit on an average desk. It also performs lithography in a different way and on a different scale. For example, commercial semiconductor fabrication equipment can produce features in the single-digit-nanometer range. On information and belief, TERA-print's desktop products create structures that are hundreds of nanometers or larger—orders of magnitude too large to substitute for the industrial lithography systems used to manufacture semiconductor chips at commercial scale. For someone in these industries, it would be impossible to confuse the two technologies.

34. Nevertheless, not long after the announcement of the Terafab project, TERA-print sought to expand the scope of its trademark coverage. On May 22, 2026, the day before it issued the cease-and-desist letter but four days *after* Tesla

[1] Josh Norem, *ASML Shows Off Next-Generation, $380 Million High-NA EUV Lithography Machines*, ExtremeTech (Feb. 12, 2024), https://www.extremetech.com/computing/asmls-shows-off-next-generation-380-million-high-na-euv-lithography-machines.

had filed its TERAFAB applications with the USPTO, TERA-print filed a new TERA-FAB application (Serial No. 99/840,889) covering a substantially broader range of Class 9 goods and Class 42 services. That application includes goods and services directed to semiconductor-related materials, silicon chips, nanoelectronic devices, photolithography technologies, advanced materials, and artificial-intelligence design and development services. TERA-print's May 2026 application represents an opportunistic expansion from the lithography instruments and printing-pen arrays covered by its existing TERA-FAB registration to capabilities far beyond anything its technology can actually achieve. The timing—two months after Musk's high-profile announcement and just days after Tesla's filings—speaks for itself.

35. Following this dubious application for expansion of its alleged trademark rights, TERA-print demanded in the cease-and-desist letter that Plaintiffs immediately and permanently discontinue use of the Terafab name in connection with Tesla, SpaceX, and SpaceXAI's factory project. On June 10, 2026, TERA-print escalated its threats, indicating its intent to sue Plaintiffs in an improper forum for federal trademark infringement and false designation of origin, violations of state-law Uniform Deceptive Trade Practices and Consumer Fraud and Deceptive Business Practices Acts, and common law trademark infringement.

36. TERA-print's threats have created an actual, immediate, and justiciable controversy between the parties. Plaintiffs attempted to resolve the dispute informally through meetings with TERA-print's counsel on June 18, June 23, June 25, July 31, August 14, and August 24, 2026. Ultimately, however, TERA-print effectively ended the parties' negotiations. Faced with TERA-print's threats and its unwillingness to meaningfully negotiate, Plaintiffs were compelled to seek judicial resolution of this dispute.

**D. The Tesla TERAFAB Marks Do Not Infringe**

37. TERA-print's infringement theory is meritless, including because no reasonable consumer is likely to confuse Plaintiffs' planned chip factory with TERA-print's desktop pen lithography instruments, either directly or via reverse confusion.

38. The likelihood of confusion—whether forward or reverse—is vanishingly small because the parties' products, customers, and commercial contexts are all fundamentally different. Plaintiffs' Terafab refers to a first-of-its-kind manufacturing plant designed to bring together chip design and manufacturing, logic, memory, and packaging to accelerate the production of computer chips. TERA-print's products, by contrast, are on information and belief desktop lithography instruments designed primarily for research applications involving microscopic patterning on surfaces of specialized sensors and other materials. Plaintiffs do not intend to manufacture or sell desktop lithography instruments. Nor is TERA-print designing, manufacturing, or selling semiconductor chips, manufacturing equipment used to produce semiconductor chips at scale, or operating a semiconductor chip foundry.

39. Terafab's potential customers, if any, could include large strategic technology partners in chip-design, AI, data storage, robotics, and automation. On the other hand, TERA-print's customers appear to consist primarily of academic institutions, researchers, and laboratories seeking tools for micro-scale fabrication. Such sophisticated purchasers are unlikely to believe that Terafab's planned chip foundry originates from TERA-print—or conversely, that TERA-print's desktop lithography instruments are somehow affiliated with Plaintiffs—merely because the parties' marks use similar terms, particularly where the marks are used in fundamentally different commercial contexts.

40. The parties' trademark filings reflect this dichotomy. Before its opportunistic expansion, TERA-print's registration covered specialized polymer pen and beam pen lithography instruments, 2D and 3D micro- and nano-scale printers, and micro-fabricated printing pen arrays. By contrast, Plaintiffs' TERAFAB applications identify semiconductor chips, memory chips, integrated circuits, semiconductors, microchips, semiconductor distribution services, custom semiconductor manufacturing services, semiconductor design services, semiconductor research services, semiconductor testing services, and microchip design services.

41. Moreover, there is no known evidence of actual confusion—in either direction—between Tesla's TERAFAB Marks and TERA-print's marks. On information and belief, there have been no misdirected communications, mistaken inquiries, customer complaints, or other marketplace evidence showing actual confusion between Plaintiffs and TERA-print. And this is true even despite the public nature of Plaintiffs' Terafab announcement and development.

42. For these and other reasons, the Tesla TERAFAB Marks do not infringe any rights held by TERA-print.

## CAUSE OF ACTION

### Declaratory Judgment

43. Plaintiffs incorporate by reference paragraphs 1 through 42 as though fully set forth herein.

44. The Declaratory Judgment Act, 28 U.S.C. § 2201(a), provides that "[i]n a case of actual controversy within its jurisdiction," a federal court "may declare the rights and other legal relations of any interested party seeking such declaration."

45. An actual, substantial, and immediate controversy exists between Plaintiffs and TERA-print concerning whether Plaintiffs' current and planned use of the Tesla TERAFAB Marks infringes any rights claimed by TERA-print in the

TERA-FAB mark. TERA-print has asserted that Plaintiffs' use of Terafab is likely to cause confusion with TERA-print's products and infringes TERA-print's alleged TERA-FAB mark, U.S. Trademark Registration No. 6,295,482. TERA-print has demanded that Plaintiffs immediately and permanently discontinue use of the Terafab name in connection with Plaintiffs' Terafab project. TERA-print has also threatened to sue Plaintiffs for federal trademark infringement, common law trademark infringement, false designation of origin, and state-law unfair competition.

46. Plaintiffs deny that their current or planned use of the Tesla TERAFAB Marks infringes or will infringe any rights claimed by TERA-print. TERA-print cannot establish a likelihood of confusion because, for example, the parties' goods, services, customers, and commercial contexts do not meaningfully overlap. The Tesla TERAFAB Marks concern a planned chip factory and related semiconductor goods and services, while TERA-print's business concerns desktop lithography instruments and related printing tools.

47. A declaratory judgment will serve a useful purpose by resolving the legal uncertainty created by TERA-print's threats and clarifying the parties' respective rights. Without declaratory relief, Plaintiffs face a continuing cloud over their ability to develop, protect, and use the Tesla TERAFAB Marks in connection with the Terafab project, while TERA-print continues to assert infringement theories that Plaintiffs deny. A declaration of noninfringement will settle the controversy, confirming that Plaintiffs' current and planned use is not likely to cause confusion, and permit Plaintiffs to proceed without the ongoing threat of unfounded trademark claims.

48. Plaintiffs therefore seek a declaration that:

(a) Plaintiffs' current and planned use of the Tesla TERAFAB Marks does not create a likelihood of confusion with TERA-print's TERA-FAB mark;

(b) Plaintiffs' current and planned use of the Tesla TERAFAB Marks does not infringe any rights claimed by TERA-print in U.S. Trademark Registration No. 6,295,482 or otherwise violate 15 U.S.C. §§ 1114 or 1125(a);

(c) Plaintiffs' current and planned use of the Tesla TERAFAB Marks does not constitute deceptive trade practices, consumer fraud, or unfair or deceptive business practices under the law of any relevant jurisdiction;

(d) Plaintiffs' current and planned use of the Tesla TERAFAB Marks does not constitute trademark infringement, unfair competition, or misappropriation of TERA-print's goodwill; and

(e) TERA-print is not entitled to injunctive relief, damages, disgorgement, corrective advertising, destruction of materials, attorneys' fees, or any other remedy against Plaintiffs based on Plaintiffs' current or planned use of the Tesla TERAFAB Marks.

49. Absent declaratory relief from this Court, Plaintiffs will continue to suffer ongoing and irreparable harm in the form of uncertainty over their ability to develop, protect, and use the Tesla TERAFAB Marks; and the continuing threat of litigation over trademark claims that Plaintiffs deny.

## DEMAND FOR RELIEF

Plaintiffs respectfully request that the Court enter judgment in Plaintiffs' favor as follows:

1. An order rendering the declaratory judgment requested above;

2. An order enjoining TERA-print from asserting infringement theories inconsistent with the Court's declaratory judgment;

3. Awarding Plaintiffs their costs and attorneys' fees as permitted by law; and

4. Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs request a trial by jury on all issues so triable.

Dated: September 15, 2026

Respectfully submitted,

*/s/ Travis R. Wimberly*
Travis R. Wimberly (TX 24075292)
Alexandra R. Curren (TX 24142816)
twimberly@pirkeybarber.com
acurren@pirkeybarber.com
**PIRKEY BARBER PLLC**
1801 East 6th Street, Suite 300
Austin, Texas 78702
Telephone: (512) 322-5200

*Attorneys for Plaintiffs Tesla, Inc., Space Exploration Technologies Corp., and SpaceXAI LLC*

Andrei Iancu (*pro hac vice* forthcoming)
iancua@sullcrom.com
Amy E. Proctor (*pro hac vice* forthcoming)
proctora@sullcrom.com
Caleb J. Downs (*pro hac vice* forthcoming)
downsc@sullcrom.com
Emily D. Olsen (*pro hac vice* forthcoming)
olsenem@sullcrom.com
**SULLIVAN & CROMWELL LLP**
1888 Century Park East
Los Angeles, California 90067
Telephone: (310) 712-6600

*Attorneys for Plaintiff Tesla, Inc.*

Megan K. Bannigan (*pro hac vice* forthcoming)
mkbannigan@debevoise.com
Jared I. Kagan (*pro hac vice* forthcoming)
jikagan@debevoise.com
**DEBEVOISE & PLIMPTON LLP**
66 Hudson Blvd.
New York, NY 10001
Telephone: (212) 909-6000

*Attorneys for Plaintiffs Space Exploration Technologies Corp. and SpaceXAI LLC*